**UNITED STATES COURT OF INTERNATIONAL TRADE**

ELEMENT TV COMPANY, LP,

Plaintiff,

v.

UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; and the UNITED STATES OF AMERICA,

Defendants.

Court No. 26-01131

**COMPLAINT**

Plaintiff Element TV Company, LP, by and through its attorneys, alleges and states:

1. This action concerns Defendants' unlawful imposition of new tariffs on goods imported into the United States through a series of executive orders beginning in February 2025.

2. In issuing these executive orders, President Trump unlawfully relied on the International Emergency Economic Powers Act ("IEEPA"), claiming that IEEPA grants the President authority to impose tariffs.

3. This Court and the Court of Appeals for the Federal Circuit have already held that the IEEPA does no such thing. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025).

4. Plaintiff is an importer of goods subject to the tariffs at issue.

5. Plaintiff asks the Court to find, as it did in *V.O.S. Selections*, that IEEPA does not authorize the tariffs imposed by the Defendants, to declare the tariffs and the executive orders directing them unlawful, and to enjoin Defendants from imposing and enforcing the tariffs at issue.

6. A decision from the Supreme Court on whether IEEPA authorizes the tariffs is pending following the November 5, 2025 oral argument in *V.O.S. Selections* and the companion case *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

7. Even if the Supreme Court holds the tariffs at issue to be unlawful, that will not necessarily ensure a remedy for importers such as Plaintiff who will have paid significant tariffs unlawfully collected by the government.

8. Plaintiff brings this action now to ensure that liquidation with respect to the entries for which Plaintiff paid IEEPA tariffs does not occur before the Supreme Court's decision and/or to preserve its right to a refund with respect to those entries.

9. This Court should (i) declare that IEEPA does not authorize the tariffs and that the tariffs and executive orders imposing them are unlawful; (ii) issue an injunction preventing Defendants from imposing any further IEEPA tariffs on Plaintiff; (iii) order Defendants to refund (with interest) all tariffs that Plaintiff paid and continues to pay pursuant to the executive orders and IEEPA tariffs; and (iv) order Defendants to reliquidate previously liquidated entries, if necessary.

**PARTIES**

10. Plaintiff, Element TV Company, LP, is a U.S.-based company organized in the State of Delaware with its headquarters located in Minnesota. Element TV Company, LP specializes in consumer electronics manufacturing and distribution.

11. Defendant United States Customs and Border Protection ("CBP") is an agency of the United States Department of Homeland Security headquartered in Washington, D.C. CBP collects duties on imports into the United States and collected the payments Plaintiff made pursuant to the IEEPA tariffs.

12. Defendant Rodney S. Scott is the Commissioner of CBP and oversees CBP's collection of the duties Plaintiff paid pursuant to the IEEPA tariffs. Mr. Scott is sued in his official capacity.

13. Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

**JURISDICTION**

14. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i), which confers "exclusive jurisdiction" on the Court over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue[.]" 28 U.S.C. § 1581(i)(1)(B); *see also V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1328–1329 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

15. The Court also has subject-matter jurisdiction over this action under 28 U.S.C. § 2631(i), stating that "[a]ny civil action of which the Court of International Trade has jurisdiction . . . may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." 28 U.S.C. § 2631(i).

16. The Court has "all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." 28 U.S.C. § 1585. In a civil action under 28 U.S.C. § 1581, the Court can enter a money judgment against the United States and can order "any other form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition." 28 U.S.C. §§ 2643(a)(1), (c)(1).

## STANDING

17. Plaintiff has standing to sue because the IEEPA tariffs imposed by Defendants adversely affected and aggrieved Plaintiff as the importer of record for goods from countries to which the IEEPA tariffs apply who was consequently required to pay these unlawful tariffs. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof"); 28 U.S.C. § 2631(i).

18. Declaratory and injunctive relief can redress these injuries. Without injunctive relief, Plaintiff will suffer imminent and irreparable harm if the entries for which it paid IEEPA tariffs are liquidated.

## GENERAL ALLEGATIONS

### I. Background

#### A. Legal authority to impose tariffs

19. Through the Omnibus Trade and Competitiveness Act of 1988, Congress created the Harmonized Tariff Schedule of the United States ("HTSUS"). Pub. L. 100-418, 102 Stat. 1107 (1988).

20. The HTSUS establishes tariff rates in the United States, and the United States International Trade Commission ("ITC") maintains and publishes the current Harmonized Tariff Schedule consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; *Michael Simon Design, Inc. v. United States*, 637 F. Supp. 2d 1218, 1225 (Ct. Int'l Trade 2009) (citation omitted) ("The authority to modify the HTSUS lies with the President, who may do so, at his complete discretion, based on the recommendations by the ITC."); *Maple Leaf Marketing, Inc. v. United States*, 528 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021) (discussing presidential amendment of HTSUS by proclamation).

21. The CBP is responsible for assessing and collecting duties on imports into the United States. *See* 19 U.S.C. §§ 1500, 1502.

22. The CBP classifies imported merchandise in accordance with the HTSUS. 19 C.F.R. § 152.11.

23. The CBP thus assesses and collects duties on imports entering the United States using the HTSUS classifications of the goods and the rates HTSUS established under the applicable classification. 19 U.S.C. §§ 1202, 1500, 1502.

24. The HTSUS is periodically modified according to a statutory scheme contained in the Omnibus Trade and Competitiveness Act of 1988 to account for changes to the international harmonized tariff system. *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1336–37 (Fed. Cir. 2010).

**B. The process of levying tariffs or duties on imports**

25. When goods are imported into the United States, the importer of record submits a customs declaration to provide information on the goods' value, origin, and HTSUS classification, and pays an *estimated* duty on the entry based on that information. 19 U.S.C. § 1484.

26. CBP reviews the customs declaration to confirm that the information is correct and to determine the final amount of duty owed on the goods. 19 U.S.C. § 1500.

27. After CBP issues a final appraisement of the goods, it "liquidates" the entry and notifies the importer whether it owes additional funds or will receive a refund. 19 U.S.C. § 1504.

28. "Liquidation" is thus the "final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1.

29. Liquidation must typically occur within one year. 19 U.S.C. § 1504(a). CBP provides notice of liquidation of entries on its website. 19 C.F.R. § 159.9(a).

30. However, CBP may extend the deadline for liquidation for up to one year at the importer's request if good cause exists. *See* 19 U.S.C. § 1504(b)(2); 19 C.F.R. § 159.12(a)(1)(ii).

31. If an importer wishes to protest a liquidation after liquidation occurs, it can file a protest within 180 days, but only if the liquidation is protestable. 19 U.S.C. § 1514.

32. A liquidation is *not* protestable if CBP was acting without discretion in imposing the duty. 19 U.S.C. § 1514; *Rimco Inc. v. United States*, 98 F.4th 1046, 1052–53 (Fed. Cir. 2024).

33. Some courts have suggested that an importer may not have a remedy allowing it to receive a refund for tariffs or duties it paid after the entry has liquidated, even if the duty itself is later found to be unlawful. *See In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1363–66 (Ct. Int'l Trade 2021) (discussing, in dicta, this Court's view that it has "explicit power to order reliquidation and refunds where the government has unlawfully exacted duties"[1] while observing that "the Court of Appeals has explicitly and implicitly called the breadth of the CIT's statutory authority into question."); *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025) (quoting *Agro Dutch Indus. Ltd. v. United States*, 589 F.3d 1190 (Fed. Cir. 2009)) (recognizing a "general rule" that "liquidation moots a party's claims pertaining to the liquidated entries.").

34. This Court can suspend liquidation pursuant to its equitable powers. *See, e.g.*, *In re Section 301 Cases*, 524 F. Supp.3d at 1365–66, 1372 (granting plaintiffs' motion for preliminary injunction to temporarily restrain liquidation).

[1] This Court recently confirmed its view that it has "the explicit power to order reliquidation and refunds where the government has unlawfully exacted duties." *AGS Co. Auto. Sols., v. United States Customs & Border Prot.*, No. 25-154, slip op. at 6 (Ct. Int'l Trade Dec. 15, 2025) (quoting *In re Section 301 Cases*, 524 F. Supp. at 1363).

## II. President Trump issued and continues to issue multiple executive orders implementing new tariffs.

35. On January 20, 2025, the President declared a national emergency at the United States' border with Mexico through Proclamation No. 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 20, 2025), which stated that "America's sovereignty is under attack . . . [from] cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans" at the border as threats to the United States. Proclamation No. 10886, 90 Fed. Reg. at 8,327.

36. On February 1, 2025, the President issued Executive Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1, 2025), stating that Mexican drug trafficking organizations posed a threat to United States' national security, foreign policy, and economy, that the Mexican government is allied with, and protects, these organizations, and that "[i]mmediate action" to address these threats was necessary in the form of ad valorem tariffs on Mexican products being imported into the United States. Exec. Order No. 14194, 90 Fed. Reg. at 9,117–18.

37. The same day, the President also expanded the scope of the national emergency in Proclamation No. 10886 to include threats from Canada and the People's Republic of China and issued two more executive orders imposing tariffs on imports from those countries. *See* Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113, 9,113–15 (Feb. 1, 2025); Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121, 9,121–22 (Feb. 1, 2025).

38. Executive Order No. 14193 imposed additional 25 percent ad valorem duties on imports from Canada. Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. at 9,113–14 (Feb. 1, 2025).

39. Executive Order No. 14194 imposed additional 25 percent ad valorem duties on imports from Mexico. Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. at 9,118 (Feb. 1, 2025).

40. Executive Order No. 14195 imposed additional 10 percent ad valorem duties on imports from China. Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. at 9,122 (Feb. 1, 2025).

41. These executive orders directed the Secretary of Homeland Security to modify the Harmonized Tariff Schedule of the United States (HTSUS) in order to implement the new, higher tariffs. 90 Fed. Reg. at 9,115, 9,118, 9,123.

42. The tariffs described above in paragraphs 36–41 are collectively known as the "Trafficking Tariffs."

43. Almost immediately, multiple amendments and other changes to the Trafficking Tariffs ensued through a barrage of further executive orders. *See, e.g.*, Exec. Order No. 14197, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 3, 2025); Exec. Order No. 14198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 3, 2025); Exec. Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,277 (Feb. 5, 2025); Exec. Order No. 14231, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,785 (Mar. 6, 2025); Exec. Order No. 14232, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11,787 (Mar. 6, 2025); Exec. Order No.

14256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025).

44. In a March 3, 2025 executive order, the President stated that China "ha[d] not taken adequate steps to alleviate the illicit drug crisis . . . and that the crisis described in Executive Order 14195 ha[d] not abated" and increased the ad valorem duties on goods imported from China from 10 percent to 20 percent. Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463, 11,463 (Mar. 3, 2025).

45. On April 2, 2025, the President issued Executive Order No. 14257, which imposed baseline 10 percent ad valorem duties on nearly all imported goods and additional duties ranging from 11 percent to 50 percent on 57 countries (collectively, "Reciprocal Tariffs"). Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041, 15,045, 15,049–50 (Apr. 2, 2025). Like the Trafficking Tariffs, the Reciprocal Tariffs modified the HTSUS to effectuate the new, additional tariffs. *Id*. at 15,047.

46. The President relied on claimed authority under the IEEPA in imposing both the Trafficking Tariffs and the Reciprocal Tariffs. 90 Fed. Reg. at 9,113–16, 9,117–19, 9,121–24, 15,041, 15,048.

47. On April 8, 2025, following China's response with its own set of new tariffs on U.S. goods, the President raised the Reciprocal Tariff rate from 34 to 84 percent. Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509, 15,509 (Apr. 8, 2025).

48. On April 9, 2025, the President suspended the country-specific ad valorem rates for all countries except China until July 9, 2025. Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025). For Chinese imports, the President again amended the Reciprocal Tariff rate, increasing it from 84 to 125 percent. *See id*.

49. Following discussions with China, the President lowered the Reciprocal Tariff rate for imports from China to 10 percent. Exec. Order No. 14298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831, 21,831–32 (May 12, 2025).

50. On July 30, 2025 the President imposed an additional ad valorem tariff rate of 40 percent on imports from Brazil. Exec. Order 14323, *Addressing Threats to the United States by the Government of Brazil*, 90 Fed. Reg. 37,739, 37,739–40 (July 30, 2025). This additional 40-percent tariff was terminated for certain agricultural products through another executive order issued on November 20, 2025 following negotiations with the President of Brazil. Exec. Order 14361, *Modifying the Scope of Tariffs on the Government of Brazil*, 90 Fed. Reg. 54,467, 54,467 (Nov. 20, 2025).

51. On July 31, 2025, the President issued Executive Order 14326, imposing further tariffs on certain trading partners, including a new 25-percent ad valorem rate on imports from India. Exec. Order 14326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37,963, 37,963–64, 37,967 (July 31, 2025).

52. On August 6, 2025, Executive Order 14329 imposed even more stringent tariffs on imports from India. The Executive Order instituted an additional 25 percent ad valorem rate on imports from India after finding that "the actions of the Government of the Russian Federation

with respect to the situation in Ukraine . . . pose[d] an unusual and extraordinary threat to the national security and foreign policy of the United States" and that the government of India had been importing oil from the Russian Federation ("Russian Oil Tariffs"). Exec. Order 14329, *Addressing Threats to the United States by the Government of the Russian Federation*, 90 Fed. Reg. 38,701, 38,701 (Aug. 6, 2025).

53. As the initial Trafficking and Reciprocal Tariffs, the amendments and modifications continued to invoke the IEEPA and implemented changes to the HTSUS.

**III. Plaintiff's payment of preliminary IEEPA tariffs**

54. Plaintiff imports consumer electronics, such as, televisions, monitors and soundbars, which Plaintiff cannot source domestically, for its business.

55. Plaintiff's goods subject to the tariffs entered the United States under revised HTSUS classifications from foreign countries, including China, Japan, Thailand, Taiwan and Vietnam, with February 20, 2025, being the date of Plaintiff's first entry that was subject to the IEEPA tariffs.

56. Plaintiff has paid IEEPA tariffs, and these payments are ongoing and continuous.

57. Liquidation on one entry for which Plaintiff has paid IEEPA tariffs occurred on May 2, 2025.

58. Liquidation on entries for which Plaintiff has paid IEEPA tariffs is likely to occur on or after May 2, 2025.

**IV. The IEEPA tariffs are unlawful.**

**A. The President's reliance on IEEPA is unfounded.**

59. The executive orders implementing the tariffs at issue claim to rely on IEEPA, 50 U.S.C. § 1701 *et seq.*; the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*; section

604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483; and 3 U.S.C. § 301. None of these statutes authorize the President to impose tariffs.

60. The NEA addresses procedures for declaring and ending national emergencies; section 604 of the Trade Act of 1974 requires the President to update the HTSUS to reflect import duties but provides no additional authority; and 3 U.S.C. § 301 permits the President to delegate powers within the Executive Branch.

61. IEEPA does not even use the words "tariff," "duty," or their equivalents.

62. Instead, IEEPA provides that the President may "investigate, regulate, or prohibit" (i) foreign exchange transactions; (ii) bank payments involving interests of a foreign country or foreign national; and (iii) imports and exports of currency or securities. 50 U.S.C. § 1702(a)(1)(A).

63. IEEPA also permits the President to "investigate, block . . . , regulate, direct . . . , void, . . . or prohibit" the acquisition, holding, use, transfer, and import or export of transactions involving property in which a foreign country or national has an interest and which is subject to United States jurisdiction. 50 U.S.C. § 1702(a)(1)(B).

64. Finally, in the event the United States is engaged in armed conflict or has been attacked by a foreign actor, the IEEPA allows the President to confiscate property subject to United States jurisdiction belonging to a foreign person, organization, or country that the President determines participated in such hostilities. 50 U.S.C. § 1702(a)(1)(C).

**B. The United States Constitution does not permit the President to impose tariffs.**

65. The United States Constitution assigns all legislative powers to Congress. *See* U.S. CONST. art. I, § 1.

66. For example, Congress may "lay and collect Taxes, Duties, Imposts and Excises . . ." pursuant to the "Taxing Clause." U.S. CONST. art. I, § 8, cl. 1. It may also "regulate

Commerce with foreign Nations . . ." under the "Commerce Clause." U.S. CONST. art. I, § 8, cl. 3.

67. To the extent the Constitution allows Congress to delegate any of its constitutional authority to the Executive Branch, Congress must provide clear guidance—an "intelligible principle"—to limit any such delegation and the President's discretion. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 672–73 (2025).

68. As the chaotic imposition of and numerous changes to the IEEPA tariffs demonstrate, IEEPA lacks any such guidance.

69. In effect, because Congress makes no mention in IEEPA of an intelligible principle limiting the purported delegation of its authority, it follows that either IEEPA does not delegate the powers of Congress to the President, or IEEPA is unconstitutional.

70. Congress must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson Corp.*, 529 U.S. 120, 160 (2000)) (citations omitted); *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023) (citing *King v. Burwell*, 576 U.S. 473, 485 (2015)) (explaining that in the absence of such clear guidance from Congress, courts may not assume that Congress intended delegation).

71. The tariffs at issue here plainly qualify as actions of "vast economic and political significance." Yet IEEPA neither mentions tariffs nor duties, nor does it reside within the statutory framework governing Congress' trade laws contained in Title 19 of the U.S. Code.

72. Because IEEPA lacks clear authorization from Congress delegating tariff powers to the President—and indeed lacks any provisions addressing tariffs or duties whatsoever—the

President's reliance on it in instituting the tariffs at issue is misplaced. The tariffs are illegal and unenforceable.

**C. Judicial rulings to date confirm the IEEPA tariffs are illegal.**

73. In *V.O.S. Selections*, this Court enjoined the enforcement of the tariffs against the plaintiff. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d. 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025) (granting summary judgment for plaintiff to prevent enforcement of IEEPA tariffs). The Federal Circuit affirmed this Court's decision on appeal. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

74. In another case, the U.S. District Court for the District of Columbia more broadly held that the IEEPA does not authorize tariffs. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209, 233 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025). Although that decision was also appealed, the United States Supreme Court granted certiorari in both *V.O.S. Selections* and *Learning Resources* before the Court of Appeals for the D.C. Circuit heard arguments in *Learning Resources*.

75. The Supreme Court consolidated the cases and heard oral arguments on November 5, 2025.

**<u>COUNT I</u>**

**<u>The Tariff Orders are Ultra Vires and Unenforceable</u>**

76. Plaintiff incorporates the preceding paragraphs herein by reference.

77. This Court has held that the President acted outside of his authority under the IEEPA, 50 U.S.C. § 1701 *et seq.* in imposing tariffs on imported goods, explaining that the IEEPA does not authorize tariffs on imports and contains no clear delegation by Congress to the President

to impose or regulate tariffs. *V.O.S. Selections, Inc. v. Donald J. Trump*, 772 F. Supp. 3d. 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025).

78. The Federal Circuit affirmed the *V.O.S. Selections* decision on appeal, observing that the tariffs implicated constitutional concerns involving the major questions and non-delegation doctrines. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

79. Under the reasoning in *V.O.S. Selections* and affirmed by the Federal Circuit, in issuing the executive orders imposing these tariffs, the President exceeded his authority, and the tariffs are unlawful, void, and unenforceable.

**COUNT II**

**The orders directing the tariffs are unconstitutional.**

80. Plaintiff incorporates the preceding paragraphs herein by reference.

81. Should the Court find that the IEEPA does authorize tariffs, the IEEPA tariffs and the orders directing them are still unlawful because such an interpretation would mean that the IEEPA improperly delegates Congress' powers to the President.

82. The United States Constitution vests the power to impose duties in Congress exclusively. U.S. CONST. art. I, § 8, cl. 1.

83. Congress cannot delegate any of its powers to the President without providing clear guidance, or an intelligible principle, directing and limiting the President's discretion with respect to those delegated powers. The IEEPA has no such guidance.

84. The IEEPA tariffs are therefore unconstitutional.

## COUNT III

**Declaratory Relief Pursuant to 28 U.S.C. § 2201 and Rule 57 of the U.S. Court of International Trade**

85. Plaintiff incorporates the preceding paragraphs herein by reference.

86. Federal courts are authorized under their equitable powers to declare the rights and legal relations of parties seeking such a declaration. 28 U.S.C. § 2201(a).

87. An actual controversy exists regarding the President's authority under the IEEPA, the IEEPA's constitutionality, and CBP's authority to enforce the tariffs at issue.

88. An actual controversy also exists because Plaintiff is an importer of record who has suffered injury by paying IEEPA tariffs on its imports pursuant to the executive orders and tariffs at issue.

* * *

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. enter judgment in favor of Plaintiff;

b. declare that the IEEPA tariffs are ultra vires and void *ab initio* with respect to Plaintiff;

c. declare that CBP lacks authority to impose and collect any tariffs set out in the HTSUS based on the IEEPA tariffs and the executive orders directing them with respect to Plaintiff;

d. enjoin Defendants from imposing and enforcing any tariffs set out in the HTSUS based on the IEEPA tariffs and the executive orders directing them with respect to Plaintiff, including, but not limited to, by suspending any liquidation pursuant to those tariffs and executive orders or extending liquidation until the United States Supreme Court issues a final decision on the issues;

e. order the United States to refund Plaintiff, with interest as permitted by law, the funds Plaintiff paid on entries pursuant to the IEEPA tariffs and the associated executive orders including by ordering Defendants to reliquidate previously liquidated entries, if necessary;

f. award Plaintiff its costs and reasonable attorneys' fees; and

g. grant Plaintiff such other relief as the Court may deem appropriate.

Dated: February 20, 2026

Respectfully submitted,

*/s/ Nithya Nagarajan*

Nithya Nagarajan
Cortney Morgan
Robert Stang
Michael Klebanov
Joseph Diedrich
Stephen Brophy

HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue NW,
Suite 1000
Washington, DC 20006
Tel. (202) 378-2300
nithya.nagarajan@huschblackwell.com

*Counsel to Plaintiff*